**No. 25-1787**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

JOHN DOE,
through his parents and next friends JIM DOE and JANE DOE,
*Plaintiff-Appellant,*

v.

STATE OF SOUTH CAROLINA, *et al.*,
*Defendant-Appellees.*

---

On Appeal from the United States District Court
for the District of South Carolina
Case No. 2:24-cv-06510
The Honorable Richard M. Gergel

---

## BRIEF OF PLAINTIFF-APPELLANT JOHN DOE

---

Linda M. Correia
Andrew M. Adelman
CORREIA & PUTH PLLC
1400 16th Street NW #450
Washington, DC 20036
(202) 602-6500
lcorreia@correiaputh.com

Alexandra Z. Brodsky
Sean Ouellette
Patrick Archer
Adele P. Kimmel
PUBLIC JUSTICE
1620 L Street NW, Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net

Counsel for Plaintiff-Appellant
*Additional Counsel on Next Page*

Leila Nasrolahi
Public Justice
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lnasrolahi@publicjustice.net

Joseph J. Wardenski
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
(347) 913-3311
joe@wardenskilaw.com

Harper T. Segui
LEE SEGUI PLLC
825 Lowcountry Boulevard
Unit 101
Mount Pleasant, SC 29464
(919) 600-5000
hsegui@leesegui.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

JURISDICTIONAL STATEMENT ........................................... 1

INTRODUCTION ............................................................... 2

STATEMENT OF THE ISSUES ............................................. 4

STATEMENT OF THE CASE ............................................... 4

I.   Factual background .......................................................... 4

    A.   In 2020, this Court held that public schools violate federal law if they exclude transgender students from restrooms that match their gender identities ............................................. 4

    B.   South Carolina banned transgender students from gender-appropriate restrooms anyway ................................................. 5

    C.   The ban hurts transgender students across South Carolina ................................................................... 11

    D.   John Doe is among the many students harmed by the law .. 14

II.   Procedural background ...................................................... 20

SUMMARY OF THE ARGUMENT ........................................ 25

STANDARD OF REVIEW .................................................... 28

ARGUMENT ................................................................... 29

I.   John has standing to challenge the restroom ban ....................... 29

II.   John and the putative class are entitled to a preliminary injunction ............................................................... 33

    A.   John is likely to succeed on the merits of his claims ............ 34

        1.   The ban violates Title IX .......................................... 35

        2.   The ban violates the Equal Protection Clause ............ 37

            i.   The ban triggers heightened scrutiny .................... 38

            ii.  The ban fails heightened scrutiny .......................... 42

            iii. The ban fails any level of scrutiny ......................... 44

        3.   *Grimm* is binding precedent ...................................... 45

B.    The ban will likely irreparably harm John and the class absent an injunction...............................................50

C.    The balance of equities and public interest favor enjoining enforcement of the ban............................................54

D.    The Supreme Court's cert grant in *B.P.J.* does not undermine John's entitlement to an injunction.......................................55

E.    The district court's decision to deny leave to amend the complaint does not preclude relief.........................................59

F.    The Court should grant relief to the putative class...............62

III.  The Court should direct the district court to lift the stay............63

CONCLUSION ........................................................................64

CERTIFICATE OF COMPLIANCE .......................................................67

# TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*A.A.R.P v. Trump,*
145 S. Ct. 1364 ................................................................................. 62

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
75 F.4th 760 (7th Cir. 2023) ............................................................. 30

*Al Otro Lado v. Wolf,*
952 F.3d 999 (9th Cir. 2020) ............................................................. 60

*B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.,*
98 F.4th 542 (4th Cir. 2024) ...................................................... *passim*

*Bethlehem Mines Corp. v. Henderson,*
939 F.2d 143 (4th Cir. 1991) ............................................................. 56

*Bray v. Alexandria Women's Health Clinic,*
506 U.S. 263 (1993) ........................................................................... 39

*C.G. ex rel. P.G. v. Saucon Valley Sch. Dist.,*
571 F.Supp.3d 430 (E.D. Pa. 2021) .................................................. 52

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ........................................................................... 45

*Colo. Christian Univ. v. Weaver,*
534 F.3d 1245 (10th Cir. 2008) ......................................................... 40

*Deal v. Mercer Cnty. Bd. of Educ.,*
911 F.3d 183 (4th Cir. 2018) ............................................................. 30

*Diamond Alt. Energy, LLC v. EPA,*
145 S.Ct. 2121 (2025) ........................................................................ 29

*Doe v. Wood Cnty. Bd. of Educ.,*
888 F.Supp.2d 771 (S.D. W. Va. 2012) ............................................. 54

*Edwards v. City of Goldsboro,*
  178 F.3d 231 (4th Cir. 1999) ........................................................ 28, 61

*Fitzgerald v. Barnstable Sch. Comm.,*
  555 U.S. 246 (2009) .......................................................................... 47

*Food Mktg. Inst. v. Argus Leader Media,*
  588 U.S. 427 (2019) .......................................................................... 32

*Frazier v. Prince George's Cnty.,*
  86 F.4th 537 (4th Cir. 2023) ......................................................... 58, 59

*Grimm ex rel. G.G. v. Gloucester Cnty. Sch. Bd.,*
  822 F.3d 709 (4th Cir. 2016) .............................................................. 52

*Gooch v. Life Invs. Ins. Co. of Am.,*
  672 F.3d 402 (6th Cir. 2012) .............................................................. 62

*Grimm v. Gloucester County School Board,*
  972 F.3d 586 (4th Cir. 2020) ..................................................... *passim*

*H-D Mich., LLC v. Hellenic Duty Free Shops S.A.,*
  694 F.3d 827 (7th Cir. 2012) .............................................................. 58

*H.B. Rowe Co. v. Tippett,*
  615 F.3d 233 (4th Cir. 2010) .............................................................. 42

*Horner v. Ky. High Sch. Athletic Ass'n,*
  43 F.3d 265 (6th Cir. 1994) ................................................................ 35

*K.C. v. Individual Members of Med. Licensing Bd.,*
  121 F.4th 604 (7th Cir. 2024) ............................................................. 48

*Kenny v. Wilson,*
  885 F.3d 280 (4th Cir. 2018) .............................................................. 31

*Landis v. N. Am. Co.,*
  299 U.S. 248 (1936) ...................................................................... 28, 63

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't,*
  2 F.4th 330 (4th Cir. 2021) ........................................................... 50, 54

iv

*League of Women Voters of N.C. v. North Carolina,*
   769 F.3d 224 (4th Cir. 2014) ................................................ 28, 35, 63

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ........................................................................ 29

*McClellan v. Young,*
   421 F.2d 690 (6th Cir. 1970) ....................................................... 57

*Miranda v. Garland,*
   34 F.4th 338 (4th Cir. 2022) ....................................................... 33

*Miss. Univ. for Women v. Hogan,*
   458 U.S. 718 (1982) ..................................................................... 42

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable
   Operating Co.,*
   22 F.3d 546 (4th Cir. 1994) ......................................................... 50

*N.C. State Conf. of NAACP v. McCrory,*
   831 F.3d 204 (4th Cir. 2016) .................................................. 39, 42

*Omega World Travel, Inc. v. Trans World Airlines,*
   111 F.3d 14 (4th Cir. 1997) ...................................................... 59, 60

*Peltier v. Charter Day Sch., Inc.,*
   37 F.4th 104 (4th Cir. 2022) ....................................................... 35

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) ..................................................................... 40

*Porretti v. Dzurenda,*
   11 F.4th 1037 (9th Cir. 2021) ..................................................... 53

*Qingyun Li v. Holder,*
   666 F.3d 147 (4th Cir. 2011) ....................................................... 46

*Rockwell Int'l Corp. v. United States,*
   549 U.S. 457 (2007) ..................................................................... 31

*Rodiriecus L. v. Waukegan Sch. Dist. No. 60,*
   90 F.3d 249 (7th Cir. 1996) ......................................................... 52

*Roe v. Dep't of Def.*,
   947 F.3d 207 (4th Cir. 2020)................................................................ 48

*Romer v. Evans*,
   517 U.S. 620 (1996)............................................................ 38, 44, 45

*Schwab v. Sec'y, Dep't of Corr.*,
   507 F.3d 1297 (11th Cir. 2007)............................................................ 57

*Scott v. Fam. Dollar Stores, Inc.*,
   733 F.3d 105 (4th Cir. 2013)............................................................ 1, 61

*Short v. Hartman*,
   87 F.4th 593 (4th Cir. 2023) ................................................................ 46

*Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.*,
   121 F.4th 1374 (10th Cir. 2024) ........................................................ 30

*Taylor v. Grubbs*,
   930 F.3d 611 (4th Cir. 2019)................................................................ 48

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) ................................................................ 45

*United States v. Bell*,
   5 F.3d 64 (4th Cir. 1993)................................................................ 64

*United States v. Collins*,
   415 F.3d 304 (4th Cir. 2005)................................................................ 56

*United States v. Hunt*,
   123 F.4th 697 (4th Cir. 2024) ........................................................ 46

*United States v. Skrmetti*,
   145 S.Ct. 1816 (2025)................................................................ *passim*

*United States v. Virginia*,
   518 U.S. 515 (1996)................................................................ 42

*West Virginia v. B.P.J.*,
   2025 WL 1829164 (2025) ........................................................ 22, 55

*Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) .......................................................... 43, 52

*Williford v. Armstrong World Indus., Inc.*,
  715 F.2d 124 (4th Cir. 1983) .......................................................... 63

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .......................................................... 33

*Yong v. INS*,
  208 F.3d 1116 (9th Cir. 2000) .......................................................... 56

**Statutes, Bills, and Constitutional Provisions**

20 U.S.C. § 1681(a) .......................................................... 36

20 U.S.C. § 1681 *et seq.* .......................................................... 1

20 U.S.C. § 1687 .......................................................... 36

28 U.S.C. § 1292(a)(1) .......................................................... 1, 23

28 U.S.C. § 1331 .......................................................... 1

28 U.S.C. § 1343 .......................................................... 1

H. 3094, 126th Gen. Assemb. (S.C. 2025) .......................................................... 41

H. 3095, 126th Gen. Assemb. (S.C. 2025) .......................................................... 41

H. 3263, 126th Gen. Assemb. (S.C. 2025) .......................................................... 41

H. 3506, 126th Gen. Assemb. (S.C. 2025) .......................................................... 41

H. 4025, Appropriation Bill 2025-2026, Part IB § 1.114
  (Act No. 69, 2025 S.C. Acts) .......................................................... 10, 49

H. 4302, 126th Gen. Assemb. (S.C. 2025) .......................................................... 41

H. 4465, 126th Gen. Assemb. (S.C. 2025) .......................................................... 41

H. 4515, 126th Gen. Assemb. (S.C. 2025) .......................................................... 41

H. 4538, 125th Gen. Assemb. (S.C. 2024) .................................................. 6

H. 5100, Appropriation Bill 2024-2025, Part IB § 1.120
    (Act No. 226, 2024 S.C. Acts) ............................................... 5, 6, 7, 9, 49

H. 5407, 125th Gen. Assemb. (S.C. 2024) .................................................. 6

S. 162, 126th Gen. Assemb. (S.C. 2025) .................................................. 41

S. 199, 126th Gen. Assemb. (S.C. 2025) .................................................. 41

S. 240, 126th Gen. Assemb. (S.C. 2025) .................................................. 41

S. 322, 126th Gen. Assemb. (S.C. 2025) .................................................. 41

S. 540, 126th Gen. Assemb. (S.C. 2025 ................................................... 41

S. 1213, 125th Gen. Assemb. (S.C. 2024) .................................................. 6

S.C. Code Ann. § 59-5-65 (1976) ............................................................ 36

U.S. Const. amend. XIV ............................................................................ 1

## Other Authorities

2 *Newberg & Rubenstein on Class Actions* § 4:30 (6th ed.
    2025) ............................................................................................. 62

S. Journal No. 62, 125th Session (S.C. Apr. 24, 2024)
    https://perma.cc/32KW-859R ......................................................... 6, 7

11A *Wright & Miller's Federal Practice & Procedure* § 2948.3
    (3d. ed. 2025) ............................................................................... 59

## JURISDICTIONAL STATEMENT

John Doe, through his parents Jim Doe and Jane Doe, filed this lawsuit under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*., and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, U.S. Const. amend. XIV. The district court had subject-matter jursidiction under 28 U.S.C. § 1343 and 28 U.S.C. § 1331. The district court denied John's renewed motion for a preliminary injunction, as well as his motion to amend his complaint, on July 8, 2025. JA346-347. John filed a timely notice of appeal the next day. JA348. This Court has jurisdiction to review the denial of John's renewed motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1). Am. Order 8-11, Dkt. No. 43. The Court may also exercise pendent appellate jurisdiction to review the district court's decision to stay the case, *id*. at 11, and the denial of John's motion to amend his complaint. *See, e.g.*, *Scott v. Fam. Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013).

## INTRODUCTION

Last summer, South Carolina banned transgender public school students from restrooms that match their gender identities. It knew this Court had already held, in *Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir. 2020), that such a ban violates the Constitution and Title IX. Yet the State took a gamble. The law's champion in the legislature told the press he hoped the Supreme Court would reverse this Court's precedent.

Because of the ban, John Doe, a transgender student, was suspended and threatened with expulsion, and left his middle school. He and an advocacy group sued to enjoin the law. But the district court rewarded South Carolina's wager. After sitting on John's preliminary injunction motion through the end of the academic year, which John spent trying to learn from home, the court stayed the case and denied his renewed motion for relief. It did not reach the merits. Rather, the district court, like the law's supporters, thinks the Supreme Court might, in a case presenting a different issue, disturb *Grimm*. It wanted to wait to see the outcome of that case—potentially until the end of the coming Supreme Court term next summer.

But this Court has been clear: Its precedent is binding unless and until it is abrogated by an en banc decision or irreconcilable Supreme Court decision. A grant of certiorari from the Supreme Court does not lessen circuit law's power. Because "*Grimm* remains the law"—and the State's ban "directly contradicts" it—this Court has already granted John's motion for an injunction pending appeal. Am. Order 17-20. Under that same "binding precedent," *id.* at 19, John and a putative class of transgender public school students are entitled to a preliminary injunction as the case proceeds below. And it should proceed: For the same reason the district court was wrong to deny relief, it was wrong to stay the case.

These young people cannot wait to see what the Supreme Court does next. A year is a long time for anyone, but especially for a student. John Doe already missed out on nearly an entire year of in-person public school education because of the ban. The district court's proposed delay would further deny him, and thousands of other transgender students in the state, equal access to education.

John and the putative class satisfy all the requirements for a preliminary injunction, and the district court abused its discretion in

denying that relief and staying the case. This Court should vacate the court's denial and stay and remand with instructions for the court to grant the requested preliminary injunction immediately.

## STATEMENT OF THE ISSUES

I.  Does John have standing to challenge the restroom ban?

II.  Are John and the putative class entitled to the requested preliminary injunction?

III.  Did the district court abuse its discretion in staying the case?

## STATEMENT OF THE CASE

## I.  Factual background

### A. In 2020, this Court held that public schools violate federal law if they exclude transgender students from restrooms that match their gender identities

In 2020, this Court decided *Grimm,* a Title IX and Equal Protection case brought by a transgender boy whose school forbade him from using boys' restrooms. *See* 972 F.3d 586. There, a transgender student, Gavin Grimm, brought a Title IX claim challenging his school's requirement that students use restrooms corresponding to their "biological gender[]" assigned at birth—a policy that excluded him from using the boys'

restroom. *Id.* at 598-601. "Unlike the other boys, he had to use either the girls restroom or a single-stall option." *Id.* at 618.

*Grimm* held that, if a school bans transgender students from sex-specific restrooms that match their gender identity—what this brief will refer to as "gender-appropriate restrooms"—it violates both Title IX, which prohibits sex discrimination in education, and the Equal Protection Clause of the U.S. Constitution. *See id.* at 606-19. *Grimm* also recognized that excluding transgender students from gender-appropriate restrooms predictably and regularly subjects them to significant harms with potential lifelong consequences. *See id.* at 617-18. These include health issues, such as urinary tract infections, missed class time, and substantial emotional, psychological, and dignitary injuries. *See id.*; *accord* JA119-121.

## B. South Carolina banned transgender students from gender-appropriate restrooms anyway

The South Carolina legislature knew about *Grimm*. Yet, since last summer, it has openly flouted that decision by requiring schools to exclude transgender students from gender-appropriate restrooms.

South Carolina first effectuated this ban by including it in its Fiscal Year 2024-2025 budget under the title Proviso 1.120. *See* H. 5100,

Appropriation Bill 2024-2025, Part IB § 1.120 (Act No. 226, 2024 S.C. Acts), https://perma.cc/3SXF-8JPG [hereinafter "Proviso 1.120"]. Proviso 1.120 was the culmination of a nearly year-long effort by some South Carolina legislators to prohibit transgender students from using restrooms that correspond with their gender identities. Starting in November 2023, a group of South Carolina legislators "pre-filed" and then introduced several bills, all titled the "South Carolina Student Physical Privacy Act." JA044, JA046, JA048. These bills all sought, in nearly identical terms, to ban transgender students from public school restrooms that corresponded to their gender identity. H. 4538, 125th Gen. Assemb. (S.C. 2024); S. 1213, 125th Gen. Assemb. (S.C. 2024); H. 5407, 125th Gen. Assemb. (S.C. 2024). None made it out of committee. JA044, JA046, JA048.

Undeterred, legislators turned to the state budget process. In April 2024, senators Wes Climer and Josh Kimbrell introduced Amendment 48 to the state's annual budget appropriations bill. *See* S. Journal No. 62, 125th Session (S.C. Apr. 24, 2024), https://perma.cc/32KW-859R. That amendment—which was eventually codified as Proviso 1.120—sought to prohibit transgender students from using gender-appropriate restrooms. It banned students from "enter[ing] a [school] restroom . . . that is

designated for one sex"—"as objectively determined by anatomy and ge-
netics existing at the time of birth"—"unless he or she is a member of
that sex." Proviso 1.120. It charged K-12 public school districts with en-
forcing the ban. *Id.* The penalty for failing to do so: losing 25% of the
district's state funding. *Id.*

State legislators advocating for the proviso and its predecessor bills
justified them on the basis that, in their view, transgender boys were not
really boys and transgender girls were not really girls. For example, in
explaining the purpose and intended impact of one of these proposed
laws, a cosponsor stated that the bill was "common sense legislation—
boys are boys, girls are girls, and you have to use the bathroom and locker
room that lines up with your gender." JA056. In introducing the proviso,
Senator Climer explained, "The amendment before us here stipulates in
school settings that a boy will use the boys' bathroom, the boys' locker
room, the boys' changing room. That a girl will use the girls' bathroom,
the girls' locker room, the girls' changing room." JA050. Senator Climer
then referenced an unverified story about an unidentified transgender
girl—who he falsely described as "an 18-year-old man"—using the girls'

restroom at a South Carolina high school and noted that the proviso was intended to "rectify that very obvious problem." JA050.

Citing no evidence, other legislators vaguely cast transgender students as a threat to other, non-transgender students. One co-sponsor of a predecessor bill cast transgender students as "crazy" and remarked that the bill's purpose was to "protect the innocence of our children." JA057. But the legislature did not reference any evidence suggesting that a ban would protect students. The Senate did not hear "from the public" or "from medical professionals." JA053. Instead, the legislature "rush[ed] it through" as a budget proviso. JA053.

South Carolina state legislators understood that the ban would directly flout federal law. Senator Climer, for instance, acknowledged in an April 25, 2024, press interview that the proviso would likely face a legal challenge and would probably be struck down as unconstitutional by a lower court; he expressed hope that the U.S. Supreme Court *might* come to a different result. JA066. Senate opponents of the proviso also highlighted its direct conflict with existing federal law. In a floor statement, Senator Devine warned, "We know that this amendment will be a violation of constitutional law. We could be sued; the state could be sued. . . .

8

This will clearly subject our state to legal action. We are willfully wasting taxpayer dollars to defend against something that will be found unconstitutional." JA051. And Senator Tedder highlighted the treacherous circumstances that the proviso would create for South Carolina school districts. He explained that the ban "really puts the school in a bind. . . . Now the school has to decide what they're going to do. Do we violate the Constitution, or do we risk losing [state] funds?" JA053.

Nonetheless, on June 26, 2024, the South Carolina House and Senate each voted in favor of the budget bill, which included Proviso 1.120, and Governor Henry McMaster signed it. JA072, JA074. The proviso went into effect on July 1, 2024. *See* H. 5100, Appropriation Bill 2024-2025 (Act No. 226, 2024 S.C. Acts), https://perma.cc/3SXF-8JPG ("Except as otherwise specifically provided, this act takes effect July 1, 2024.").

After the proviso passed, the South Carolina School Boards Association advised its members that the ban "conflicts with federal law," citing *Grimm*. JA231. Yet the South Carolina Department of Education issued several memoranda indicating its intent to enforce the proviso against any school district that defied its directive to discriminate against transgender students. JA074-075, JA077, JA080-081. A July 23, 2024,

memorandum to district superintendents noted that the proviso "requires" the Department of Education to "withhold 25% of state funds" from school districts that allow transgender students to use restrooms that correspond with their gender identities. JA074 One week later, a second memorandum reiterated this threat of withholding funds. JA077. And one month after that, on August 27, a third memorandum instructed school districts to comply with the proviso. JA081. This final memorandum warned schools that the agency "stands ready to enforce this proviso where noncompliance by passage of a conflicting policy or inconsistent implementation occurs." JA081.

South Carolina has now renewed the ban for Fiscal Year 2025-2026. *See* H. 4025, Appropriation Bill 2025-2026, Part IB § 1.114 (Act No. 69, 2025 S.C. Acts), https://perma.cc/3RJ3-AV8L [hereinafter "Proviso 1.114"]. The ban contained in the new budget is identical to last year's, except that it is now called Proviso 1.114. *See id.*; JA321-322. This renewed ban took "effect July 1, 2025." *See* H. 4025, Appropriation Bill 2025-2026 (Act No. 69, 2025 S.C. Acts), https://perma.cc/3RJ3-AV8L.

## C. The ban hurts transgender students across South Carolina

Thousands of transgender students attend K-12 public schools in South Carolina. *See* JA114-115. South Carolina's ban hurts all of them.

Excluding transgender students from gender-appropriate restrooms inflicts severe emotional and psychological harm, including "feelings of rejection, invalidation, isolation, shame, and stigmatization, as well as depression, anxiety, and suicidal ideation." JA115-118 It interferes with accepted protocols for the treatment of gender dysphoria, "a condition that is characterized by debilitating distress and anxiety resulting from the incongruence between an individual's gender identity and birth-assigned sex." *Grimm*, 972 F.3d at 594-95, 597; *see* JA105-106, JA118-119. And it risks lives. In one study, 85% of transgender youth who were prevented or discouraged from using a restroom that matched their gender identity reported experiencing depression, "and 60% seriously considered suicide." JA117. "Those who avoided bathrooms had twice the odds of attempting suicide in the past year compared with transgender youth who did not avoid using the bathroom." JA117.

The availability of single-stall or otherwise gender-neutral restrooms does not ameliorate these harms. As *Grimm* observed, "[t]he

stigma of being forced to use a separate restroom . . . 'invite[s] more scrutiny and attention' from other students, 'very publicly brand[ing] all transgender students with a scarlet "T".'" 972 F.3d at 617-18 (quoting *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018)).

Restroom bans like the one contained in the proviso also cause medical problems. "When being forced to use a special restroom or one that does not align with their gender, more than 40% of transgender students fast, dehydrate, or find ways not to use the restroom." *Grimm*, 972 F.3d at 597; *accord* JA120-121. "Even if transgender individuals do not avoid fluid intake, they will often hold urine in their bladders to avoid using the restroom," which can cause physical disorders such as "urinary tract or kidney infections." JA120. They "may also avoid eating certain foods (or restrict food in general) . . . leading to constipation and muscle damage/weakness." JA120-121. In one study, "67%" of transgender youth reported holding their urine to avoid using restrooms for fear of discrimination, "and 38% indicate that they avoid drinking liquids to avoid using the restroom." JA117.

Banning transgender students from gender-appropriate restrooms also raises the risk that those students will experience gender-based

12

harassment and violence, which transgender people already face at disproportionately high rates. *See* JA117. "Most transgender individuals begin using restrooms consistent with their identity after completing other aspects of social transition (wearing clothing associated with their gender, changing their hair, etc.)." JA117. For this reason, among others, transgender people "regularly face harassment and victimization in restrooms corresponding with their sex assigned at birth." JA117. Moreover, forcing a transgender student who presents as a boy to use the girls' restroom may "out" that student as transgender to his peers who only know him as a boy, and it sends an "unmistakable message" to other students "that their transgender classmates are not suitable to be among them." JA119. "Requiring transgender individuals to use facilities that do not correspond to their gender identity following a social transition thus subjects those individuals to increased risk of actual victimization as well as to the realistic fear of such victimization, with the accordant harms resulting from that stress." JA120.

These forms of discrimination interfere with transgender students' ability to learn and adversely affect their educational opportunities. The severe psychological distress, anxiety, dehydration, physical discomfort

from holding in urine, and associated harassment all "mak[e] it harder for students to concentrate in their classes and learn." JA121. Indeed, "transgender students may stop going to school because of the disaffirmation they are experiencing by not being able to use the restroom that fits their gender identity and subsequent bullying they experience when they are outed due to restroom policies at their schools." JA121.

As a result of the proviso, some South Carolina families are keeping their children out of public schools. One mother, for example, is paying for her transgender son to attend private schools despite the significant financial burden. JA171. She would like to send him to public school but knew she could not do so because of the proviso, which would "out" him to new classmates and expose him to anti-transgender harassment and other harms. JA171-172. Another South Carolina family is homeschooling their child to avoid discriminatory restroom policies. JA172. And another family is moving out of state. JA172.

## D. John Doe is among the many students harmed by the law

John Doe lives with his parents in Berkeley County. JA173. John is transgender: Although he was assigned female at birth, he is a boy, his gender identity is male, and he identifies and presents as male in all

aspects of his life. JA173. John has "always known [he is] a boy." JA173. "[S]ince he was a child," he "has dressed and presented as a boy" and wanted others to see him as a boy. JA178. They do: Due to his masculine appearance, John has been perceived as a boy by others since before he publicly identified as transgender. JA178; JA174-175. Given his longstanding and persistent masculine gender expression, John's parents were not surprised when he told them he was transgender and a boy. JA178-179.[1]

2. John started the 2024-2025 academic year as an eighth-grade student at Cane Bay Middle School, part of Berkeley County School District. JA174. In the fall 2024 semester, while at Cane Bay, John used boys' restrooms. JA174. No students complained. JA174-175. However, teachers—who do not use student restrooms—reported to the school's administrators that John was using boys' restrooms. JA174.

On or around August 27, 2024, Kamelio Johnson, an assistant principal at Cane Bay, told John that he would need to use the girls' restrooms. JA174. John explained that it would be very upsetting for him

---

[1] The district court granted John's motion to proceed under pseudonym. *See* Order 2, Dist. Ct. Dkt. No. 25.

to use the girls' restrooms, which are inconsistent with his gender identity, and other students would likely feel uncomfortable as well, since he is and looks like a boy. JA174. When Mr. Johnson told John that he could use the single occupancy restroom in the nurse's office as an alternative, John explained that he would not be comfortable using the nurse's restroom as it would single him out and put a target on his back for harassment. JA174. Also, the nurse's office was further from John's classes than boys' restrooms, so he would have had to miss class time to use the single occupancy alternative. JA174.

After telling John he would need to use girls' restrooms, Mr. Johnson spoke on the phone with Jim Doe, John's father. JA179. Mr. Johnson told Mr. Doe that John would need to use the girls' restrooms "for everyone's protection." JA179. Mr. Doe told Mr. Johnson that he would support John in using the restroom that corresponded with his gender identity. JA179. He said he hoped that Cane Bay administrators would be his allies. JA179. After those conversations, John continued to use the boys' restrooms at school. JA175.

Later in August or in early September, Mr. Doe and John met with Mr. Johnson at Cane Bay. JA175. Citing his use of the boys' restrooms,

Mr. Johnson announced that he was going to suspend John for a day. JA175. When John asked what rule in the school handbook he was violating, Mr. Johnson said he was being punished for refusing to obey his direction not to use boys' restrooms. JA175. Mr. Johnson acknowledged that the school had no written policy prohibiting John from using boys' restrooms. JA175. He said vaguely, when pressed, that "people at the district office" had "communicated to" him that transgender students cannot use restrooms matching their gender identities. JA175. Mr. Johnson also acknowledged that no students had complained about John's use of boys' restrooms. JA175.

After further discussion, the Cane Bay principal, Carol Beckmann-Bartlett, joined the meeting. JA175. She explained that the school was "dealing with . . . a state law," which she also referred to as "a proviso"—an obvious reference to the new state ban—and that the School District had adopted a policy consistent with that law over the summer. JA175. She repeatedly told John that she did not have any personal objection to him using the boys' restrooms and was not angry at him. JA175. But she explained the school could not change the law and was expected to follow it. JA175. She repeatedly expressed that she and Mr. Johnson were

merely following a directive from the School District, which was in turn following the directive of state law. JA175-176. Dr. Beckmann-Bartlett told John that if he continued to use the boys' restrooms after he returned from his suspension, his punishment would escalate, and he would risk expulsion. JA176.

The next day, John served his suspension. JA176. When he returned to school, the School District instructed teachers to closely monitor John's use of the restrooms. JA176. For the first time, teachers began leading their classes of middle school students to the restroom in lines to monitor who was using which restroom. JA176. More than once, a teacher yelled at John for trying to use a boys' restroom and prevented him from relieving himself. JA176. In those instances, John spent the rest of the school day feeling physically uncomfortable from a full bladder and having trouble focusing on his classes. JA176. The monitoring also encouraged John's peers to harass him about his gender identity. JA176.

3. In September 2024, John's parents decided to withdraw John from Cane Bay because of the school's refusal to permit John to use boys' restrooms, combined with peer harassment exacerbated by the proviso. JA180. John then enrolled in an online school, which offered fewer

educational and social opportunities than Cane Bay. JA180-181. He became academically disengaged and socially isolated. JA181. As a result, John stopped attending school. JA186. In January 2025, the online school withdrew John because of these absences. JA186. John's parents then homeschooled John for the remainder of the 2024-2025 school year using an online curriculum. JA330. Homeschooling was "no replacement for the educational and social opportunities of attending a public school in person." JA330.

After leaving the School District, John wanted to return, if only he could use boys' restrooms. JA176-177. John and his parents therefore faced an "impossible" choice for the next school year. JA331. John's parents were "desperate" for him to return to in-person education, given its social and academic benefits. JA331. But they knew that, so long as the proviso were in effect, John would face "intolerable discrimination" at school, including suspension or expulsion for using boys' restrooms. JA331. After multiple family discussions, John and his parents made the "heart-wrenching" decision to re-enroll him in a School District high school for the 2025-2026 academic year. JA331.

19

## II.    Procedural background

On November 12, 2024, John filed this lawsuit along with the Alliance for Full Acceptance ("AFFA"), a Charleston-based advocacy group, against the State of South Carolina, its Board of Education and Department of Education, its Secretary of Education, the School District, and the School District's superintendent (collectively, "the government"). *See* JA014-034. The case asserts that the proviso violates both Title IX and the Equal Protection Clause as applied to John and a putative class of transgender public school students in the state. JA031-032. As soon as the case was docketed, John filed a motion for a preliminary injunction—which would enjoin enforcement of the proviso against him and the putative class—as well as a motion for class certification. *See* JA035-037; JA182-183. After preliminary discovery, those motions were fully briefed by the end of January 2025. *See* JA009. Months later, the school year ended, foreclosing John's hope of returning for eighth grade, and the court still had not ruled.

In early June, South Carolina renewed the bathroom ban for the new fiscal year starting July 1. *See* JA336-337, JA339, JA341-342. So, John and AFFA sought a status conference to discuss, before that date,

20

how the district court would like the parties to proceed given this legislative development. *See* Mot. for Status Conference, Dist. Ct. Dkt. No. 80. When the court had not ruled on that motion by the last week of June, the plaintiffs sought leave to amend their complaint to reflect the renewal of the law. *See* JA288-292. In a separate motion, John also proposed two paths for resolving the pending motion for a preliminary injunction before the rapidly approaching start of the new school year: John could amend his motion to reflect the extension of the ban and the parties could submit supplemental briefing, or John could file a renewed motion for a preliminary injunction and the parties could engage in full expedited briefing. *See* JA323-328.

When, on July 1, the new fiscal year started and the district court still had not provided guidance, John filed a renewed motion for a preliminary injunction. JA332-334. That motion asked the district court to order the government, during the pendency of the litigation, not to "enforce, adopt, implement, or comply with the restroom-related provision of" Proviso 1.114 or "any future iteration of the [p]roviso, or any other rule, policy, or practice that" would similarly "prohibit[] transgender

students from using sex-specific school restrooms consistent with their gender identities." JA332-333.

On July 8, the district court *sua sponte* stayed the case "until the Supreme Court enters an order on the merits in [*West Virginia v.*] *B.P.J.*,"—a case about transgender students' participation in athletics— "or the Supreme Court's October 2025-June 2026 term ends, whichever is sooner." JA346. The district court explained that, in its view, "a stay pending the . . . decision in *B.P.J.* would likely promote judicial economy, provide critical guidance on key legal questions in this case, and be resolved by the end of the Supreme Court's 2026 term." JA345. In the same order, and in a subsequent entry, the Court "denied without prejudice" "[a]ll pending motions . . . with leave to restore and/or supplement" once the stay lifts. JA346-347. The Court specifically identified John's renewed motion for a preliminary injunction as one of the denied motions. JA346-347.

The next day, John noticed this appeal. JA348-349. On July 10, John filed a motion for an injunction pending appeal with the district court, asking for a decision by July 15 at 1:00 pm. JA351-353. When the district court had not ruled on the motion by that time, John filed a

motion with this Court seeking an injunction pending appeal. *See* Mot. for Inj. Pending Appeal, Dkt. No. 14-1. In its opposition to that motion, the government moved to dismiss the appeal for lack of jurisdiction. Defs.-Appellees' Combined Mot. to Dismiss Appeal & Response 5-13 [hereinafter "Combined Mot."], Dkt. No. 36-1.

On July 23, the district court denied the motion for an injunction pending appeal. *See* JA368-372. It held that John was not entitled to interim relief because "with the law plainly unsettled and in flux, Plaintiff cannot make the 'clear showing' necessary of likely success on the merits which is a threshold requirement for a preliminary injunction." JA371.

On August 12—the day before John started high school—this Court granted his motion for an injunction pending appeal and denied the government's motion to dismiss. *See* Order, Dkt. No. 42. Soon after, the Court provided an explanation of its decision. *See* Am. Order. First, it held that this Court has jurisdiction to review the district court's July 8 order under 28 U.S.C. § 1292(a)(1) because it "expressly denied" John's motion for a preliminary injunction. *Id.* at 8. That alone was enough for this Court "to exercise appellate jurisdiction." *Id.* at 8-9. Additionally, the district court's order had the practical "effect of refusing an injunction"

because it would deny John relief "for most, if not all, of the 2025-2026 academic year," which would cause "serious, perhaps irreparable" harm. *Id.* at 10-11. This Court also held it can exercise pendent jurisdiction to review the stay because it was "inextricably intertwined" with the denial of the preliminary injunction. *Id.* at 11-12.

Then this Court held that John has standing. He had standing to sue because the ban "restricted [John] from using the boys' multi-stall bathrooms" and prompted him to "withdraw and seek alternative schooling options" against his wishes. *Id.* at 13. "Given the State's past enforcement of the Proviso against [John] and its repeated commitment to its implementation throughout its public schools," there was a "a real or immediate threat" that John would be "wronged again absent judicial intervention upon returning to in-person public schools." *Id.* at 14 (citation modified). And John has standing to appeal because he adequately alleged the district court's decisions denying him relief "aggrieve [him] to this day," and reversal would redress his harm. *Id.* at 15-16. at 15-16.

Turning to John's motion for an injunction pending appeal, this Court held that John is likely to succeed on the merits based on *Grimm*. That case, it explained, "held that a school board policy that was in all

24

material respects identical to the Proviso violated Title IX and the Equal Protection Clause." *Id.* at 16-17. The Court reaffirmed that "*Grimm* remains the law of this Circuit," and the cert grant in *B.P.J.* "does not alter" *Grimm*'s "binding force." *Id.* at 17, 19. Because the ban would "infring[e] [John's] constitutional rights," the Court found that "irreparable injury is likely in the absence of an injunction." *Id.* at 17 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). And "the balance of equities and public interest support upholding the rule of law." *Id.* at 18. Here, the Court held, that meant "preventing the State from enforcing a policy that directly contradicts *Grimm*—a prior, binding decision of this Court." *Id.*

## SUMMARY OF THE ARGUMENT

**I.** As this Court has already held, John likely has standing to challenge the ban. Standing to sue is assessed at the time the complaint is filed. When John filed his lawsuit last year, he had recently withdrawn from school because the School District suspended him for using boys' restrooms and threatened to expel him. John spent the rest of eighth grade trying to learn from home without the benefits of an in-person education. That injury-in-fact was caused by the government's enforcement

of the ban and redressable by an injunction. If the Court instead assesses standing at the time of John's amended complaint, he has standing as well. Finally, John has standing to appeal because he is aggrieved by the district court's order.

**II.** The Court should grant the preliminary injunction.

**II.A.** John is likely to succeed on the merits of his Title IX and Equal Protection claims. Under this Court's precedent, the ban violates Title IX because John's sex assigned at birth is the but-for cause of the government's exclusion of him from boys' restrooms, and that exclusion injures him—as would be true for any transgender student excluded from a restroom because of the ban. The ban also violates the Equal Protection Clause because it discriminates based on both sex and transgender status, triggering heightened scrutiny, which it cannot survive. Indeed, the ban could not even survive rational basis review. John's success on the merits is dictated by this Court's decision in *Grimm*, which remains good law after *United States v. Skrmetti*, 145 S.Ct. 1816 (2025).

**II.B.** Absent an injunction, the ban will continue to irreparably harm John and other transgender students in South Carolina. This factor is satisfied whenever a case presents a likely constitutional violation.

26

Moreover, the record demonstrates that, without an injunction, John and other transgender students will suffer.

**II.C.** The balance of equities and public interest favor a preliminary injunction. Upholding constitutional and civil rights, and respect for the law of the circuit, is always in the public interest. And, here, John and other transgender students would benefit from an injunction, and the government would not be hurt by one.

**II.D.** The district court abused its discretion in denying John's motion for a preliminary injunction based on the Supreme Court's grant of certiorari in *B.P.J.* A decision of this Court is binding unless and until it is abrogated by the Supreme Court or an en banc opinion.

**II.E.** Contrary to the government's argument in its motion to dismiss, John did not need to amend his complaint to seek to enjoin the renewed proviso. If he did, the Court should reverse the district court's decision to deny John's motion to amend the complaint.

**II.F.** This Court should grant relief to all members of the putative class. Courts may issue temporary relief to a putative class prior to a

ruling on class certification. Here, that class-wide relief is appropriate and necessary to protect transgender students across the state.

**III.** The district court abused its discretion in staying the case, so this Court should also vacate that stay.

## STANDARD OF REVIEW

This Court "evaluate[s a] district court's decision to deny a preliminary injunction for an abuse of discretion, reviewing the court's factual findings for clear error and its legal conclusions de novo." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014) (citation modified). The same standard applies for review of a district court's decision to enter a stay or deny a motion to amend a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999) (amendment); *Landis v. N. Am. Co.*, 299 U.S. 248, 253 (1936) (stay). "A court abuses its discretion when it misapprehends or misapplies the applicable law." *League of Women Voters*, 769 F.3d at 235.

## ARGUMENT

## I.    John has standing to challenge the restroom ban

As this Court held when it denied the government's motion to dismiss, John has standing to sue and to appeal. *See* Am. Order 12.

1. "[S]tanding [to sue] is to be determined as of the commencement of suit." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992). So, John need only show he is likely to establish that, when he filed suit, he had an "injury in fact" that was "'likely caused by the defendant'" and would "likely be redressed by judicial relief." *Diamond Alt. Energy, LLC v. EPA*, 145 S.Ct. 2121, 2133 (2025). "The first requirement, injury in fact, requires the plaintiff to demonstrate an injury that is 'concrete,' 'particularized,' and 'actual or imminent, not speculative.'" *Id.* (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024)).).

1a. John "had Article III standing to file the [operative] complaint." Am. Order 12. When John filed this case in November 2024, he had recently left his public school because his school barred him from boys' restrooms based on the proviso. JA034, JA180-181. He was struggling to learn through an online program that offered limited live instruction, left him academically disengaged, and isolated him from peers. JA180-181.

29

This Court, in granting John's injunction pending appeal, recognized that that loss of educational opportunity was an injury in fact. Am. Order 13; *see Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187-89 (4th Cir. 2018) (holding student who withdrew from a public school because of its unlawful Bible education program had standing to sue to enjoin the program because she had to attend a different school to avoid it); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 772 (7th Cir. 2023) (noting "remote schooling" is "not a true alternative" to the "opportunity to socialize with and learn alongside" classmates in person); *Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 121 F.4th 1374, 1379 (10th Cir. 2024) (similar).

The loss was also caused by the government and redressable by an injunction. John left school because of the restroom ban, and he testified that he would return if the ban were enjoined. JA176-177; *see Deal*, 911 F.3d at 189-90 (holding injunction would redress a student's injury by allowing her to return to school without enduring a rights violation).

1b. In its motion to dismiss, the government argued that this Court lacked jurisdiction to review John's renewed motion because the district court did not allow John to amend his complaint to reflect the proviso's

30

renewal. Combined Mot. 7-8. For reasons explained below, that is wrong. *See infra* pp. 59-60. There is also a simple solution: The Court can reverse the district court's denial of John's motion to amend his complaint. *See infra* pp. 60-61.

If the Court does so, John's ability to sue would turn on his standing at the time of his amendment. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007). John can likely establish standing then, too. The School District has previously enforced the proviso against John and has threatened to continue to enforce it. JA175-176. It did so under threats from the State that it will pull funding from schools that do not enforce the proviso. JA074, JA077, JA081. As this Court has already held, that past and threatened enforcement demonstrates that, without an injunction, John is likely to be punished again when he uses boys' restrooms at school. Am. Order 14 (noting John "alleged that the State was actively seeking to enforce the Proviso, which demonstrates a likelihood of an ongoing or future injury in fact"); *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) ("[P]ast enforcement . . . is good evidence that the threat of enforcement is not chimerical.").

Absent an injunction, John will also likely experience other harms he faced at school last year due to his exclusion from those restrooms. These include trouble concentrating during class when he is forced to hold his urine and the stigma of wearing "a scarlet 'T'," *Grimm*, 972 F.3d at 617-18; *see* JA180. Those injuries would be caused by the government's enforcement of the ban and would be redressed by a preliminary injunction.[2]

2. In support of its motion to dismiss, the government also argued that John lacked standing to appeal. *See* Reply, Dkt. No. 41 at 4-5. Wrong again. To establish standing to appeal, a "litigant must demonstrate that it has suffered an actual or imminent injury that is fairly traceable to the judgment below and that could be redressed by a favorable ruling." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 432-33 (2019) (citation modified). In denying the government's motion, this Court recognized that John "has been aggrieved by the district court's challenged order,"

---

[2] This academic year, John has faced harassment and other issues that have caused him to miss some school. His parents are exploring potential solutions, including online courses. John is currently enrolled in and attending an in-person high school in the School District and his parents' hope is to keep him there or, if he has to temporarily move to online courses, to return him to an in-person School District school soon after.

which would subject him to the proviso's many harms absent relief from this Court. Am. Order. 15-16. "[T]hat's sufficient under Supreme Court precedent." *Id.* at 16.

## II. John and the putative class are entitled to a preliminary injunction

Just as John was entitled to an injunction pending appeal, he and the putative class are entitled to a preliminary injunction as the case proceeds below.

A plaintiff is entitled to a preliminary injunction if they show that they are "likely to succeed on the merits," they are "likely to suffer irreparable harm" without an injunction, "the balance of hardships tips in [their] favor," and the "injunction is in the public interest." *Winter*, 555 U.S. at 20. The balancing of the harm and public interest factors "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder,* 556 U.S. 418, 435 (2009)).

The district court abused its discretion when it denied John's renewed motion for a preliminary injunction. John meets each of the requirements for a preliminary injunction enjoining the government's enforcement of, and compliance with, the proviso's restroom provision on a

class-wide basis. Under *Grimm*, the ban violates both the Equal Protection Clause and Title IX as applied to John and the entire putative class. The proviso inflicts irreparable harm on John and the class because it violates the civil rights of all class members and inflicts grave dignitary, emotional, and educational injuries that money alone will not cure. Because the government cannot point to any state interest that justifies those harms, the balance of equities and public interest strongly favor a class-wide injunction. The Supreme Court's cert grant in *B.P.J.* changes nothing about this analysis. And this Court should instruct the district court to grant relief to not only John but to the putative class.

## A. John is likely to succeed on the merits of his claims

John contends that the government's continued enforcement of, or compliance with, the proviso with respect to his and other transgender students' access to school restrooms would violate Title IX and the Equal Protection Clause. JA031-033. As this Court just explained, *Grimm* held that a materially "identical" ban violated those laws, and that "law of this circuit" remains "binding." Am. Order 16-17. Based on a straightforward application of *Grimm*, then, John has a strong likelihood of success on the merits. Indeed, his victory is far more certain than is required to

34

satisfy this element of the preliminary injunction standard. *See League of Women Voters*, 769 F.3d at 247 ("While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they need not show a certainty of success." (citation modified)).

### 1. The ban violates Title IX

John has a likelihood of success on his Title IX claim against the State of South Carolina, the State Board of Education, the State Department of Education, and the School District (the "government institutions") because all are subject to Title IX and the proviso is nearly identical to the policy *Grimm* held violated Title IX.

1. An entity is subject to Title IX if it "operates an education program or activity which receives [federal financial] assistance." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 127 (4th Cir. 2022) (en banc). This includes entities that "control[] and manage[]" funding recipients. *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994); *accord B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 554 (4th Cir. 2024), *cert. granted sub nom.*, *West Virginia v. B. P. J.*, 2025 WL 1829164 (2025) (No. 24-43).

All four government institutions fall within the statute's reach. At a minimum, the State Department of Education and the School District are education programs or activities. *See* 20 U.S.C. § 1687 (defining a covered "program or activity" to include state and local departments and agencies as well as any "school system"). Both receive federal funding. *See, e.g.*, JA089-093 (State Department of Education); JA086 (School District). The State operates its Department of Education. And the State and State Board of Education control or manage public schools, including the School District. *See, e.g.*, S.C. Code Ann. § 59-5-65 (1976) (providing that the State Board's policies govern the State's public schools).

2. The only remaining question is whether, "on the basis of sex," the proviso "exclude[s]" students from, "denie[s] [them] the benefits of," or "subject[s] [them] to discrimination" in school. 20 U.S.C. § 1681(a). It does.

*Grimm* held that a school discriminates based on sex in violation of Title IX when it forbids transgender students from using restrooms consistent with their gender identities. *See* 972 F.3d at 616-19. This Court concluded that, because the plaintiff was excluded from boys' restrooms because of his "'biological gender' . . . his sex [was] a but-for cause for the

36

[school's] actions." *Id.* at 616-17. And, because he is transgender, that exclusion caused the plaintiff physical, educational, emotional, and dignitary harms. *Id.* at 617-18. Accordingly, the challenged policy violated Title IX. *Id.* at 619.

So too here. John has offered evidence to show that the proviso—as enforced by the government institutions—denies transgender students like him access to restrooms corresponding to their gender identities, and that he, like other transgender students, is suffering injuries as a result. *See supra* pp. 15-19. That is enough to show the requisite likelihood of success on his Title IX claims in this Court.

## 2. The ban violates the Equal Protection Clause

John is also likely to succeed on his constitutional claim. Under the Equal Protection Clause, a state may not discriminate based on sex or transgender status unless it satisfies heightened constitutional scrutiny—that is, unless the sex or gender-identity-based distinction is "substantially related to a sufficiently important governmental interest." *Grimm*, 972 F.3d at 608. Here, the ban triggers heightened scrutiny because it discriminates based on both sex and transgender status, and the government cannot meet its high burden to justify that discrimination.

Moreover, even in the absence of heightened scrutiny, a law must "bear a rational relationship to an independent and legitimate legislative end." *Romer v. Evans*, 517 U.S. 620, 633 (1996). This law does not.

### i. The ban triggers heightened scrutiny

The ban triggers heightened scrutiny for three independent reasons, any one of which is sufficient: It facially classifies based on both sex and transgender status, per *Grimm*, and, even if it did not, it was still motivated by anti-transgender discriminatory intent.

1. *Grimm* held that a policy materially identical to the proviso was subject to heightened scrutiny because, on its face, it discriminated based on sex. 972 F.3d at 607. This Court held that, because the policy determined "which bathroom a student may use based upon the sex listed on the student's birth certificate, the policy necessarily rest[ed] on a sex classification." *Id.* at 608 (citation modified). That alone was enough to trigger heightened scrutiny. The same is true here. Like the policy in *Grimm*, the proviso requires schools to designate multi-occupancy restrooms for use "'only by members of one sex,'" "'determined by anatomy and genetics existing at the time of birth,'" and it "prohibits students of the opposite sex from using the same bathrooms." JA074 (quoting Proviso 1.120).

2. *Grimm* also held that the policy triggers heightened scrutiny for an "independent[]" reason: It facially discriminated against transgender people, who constitute "a quasi-suspect class." 972 F.3d at 610-13. On its face, the policy excluded transgender boys from spaces non-transgender boys could access, and likewise for transgender girls. For the same reason, the proviso's bathroom ban—which has the identical effect—requires heightened scrutiny.

3. Even if the proviso did not facially discriminate, it would still trigger heightened scrutiny for a reason not addressed in *Grimm*: It was motivated by anti-transgender discriminatory intent. When a facially neutral policy has a disproportionate impact on a protected class, it triggers heightened scrutiny when "a discriminatory purpose" was "*a* motivating factor" behind the policy, even if it was not the "sole" or even the "primary" motive. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). A discriminatory motive need not be "malevolent"; the standard only requires a purpose "directed specifically" at the targeted class. *Bray v. Alexandria Women's Health Clinic*,

506 U.S. 263, 270 (1993); *see Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008).

South Carolina likely had such a discriminatory purpose here. In defining "sex" based on a student's "anatomy and genetics" at birth and excluding people from restrooms on that basis, Proviso 1.114(A)(3), the ban's only real-world effect is to exclude transgender boys from boys' restrooms and transgender girls from girls' restrooms. "[W]hen the adverse consequences of a law upon an identifiable group" are so "inevitable," "a strong inference that the adverse effects were desired can reasonably be drawn." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979).

Moreover, as this Court has already recognized, the overwhelming evidence indicates that bans like the proviso do not serve their common justification—"protecting student privacy"—and instead reflect stereotypes and biases against transgender people. *See, e.g.*, *Grimm*, 972 F.3d at 608-10, 613-15 (explaining that bathroom ban was rooted in baseless stereotypes, not evidence). Here, legislators did not cite any evidence, hear any testimony, or make any findings that demonstrate the law protected students' privacy. *See* JA053 (statement of Senator Devine noting that legislators did not hear "from the public" or "from medical

40

professionals" or "get[ ] additional information" before passing the law); *see also infra* pp. 43-44 (discussing lack of substantiation for the state's putative privacy justification). Rather, multiple legislators' statements reflect anti-transgender prejudice and an intent to enforce gender conformity. *See supra* pp. 7-8 (quoting statements by ban's co-sponsors that the bill reflected that "boys are boys, girls are girls" and that allowing transgender students to use restrooms that aligned with their gender identity was "catering to a crazy"). Indeed, the ban was part of a raft of other bills that targeted transgender people.[3]

Finally, the proviso was "rush[ed] . . . through" the budget process, JA053, with less than fourteen minutes of debate, JA336, after it repeatedly failed to pass through the normal process, *see supra* pp. 5-7. Such a "rushed . . . legislative process . . . strongly suggests an attempt to avoid in-depth scrutiny" and "provides another compelling piece of the puzzle

---

[3] *See, e.g.*, JA024 (listing twenty-five bills introduced in 2023-2024); H. 3506, 126th Gen. Assemb. (S.C. 2025); H. 3263, 126th Gen. Assemb. (S.C. 2025); S. 199, 126th Gen. Assemb. (S.C. 2025); S. 240, 126th Gen. Assemb. (S.C. 2025); S. 162, 126th Gen. Assemb. (S.C. 2025); H. 3094, 126th Gen. Assemb. (S.C. 2025); S. 322, 126th Gen. Assemb. (S.C. 2025); H. 4302, 126th Gen. Assemb. (S.C. 2025); S. 540, 126th Gen. Assemb. (S.C. 2025); H. 4465, 126th Gen. Assemb. (S.C. 2025); H. 3095, 126th Gen. Assemb. (S.C. 2025); H. 4515, 126th Gen. Assemb. (S.C. 2025).

of the [legislature's discriminatory] purpose." *N.C. State Conf. of NAACP*, 831 F.3d at 228-29. Taken together, then, the "totality of the relevant facts" indicates that an intent to treat transgender people differently was at least "*a* motivating factor" behind the proviso. *Id.* at 220.

### ii. The ban fails heightened scrutiny

For a law to survive heightened scrutiny, the government must establish an "exceedingly persuasive justification" for the discrimination. *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). The burden to justify such a law "rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The bar is high: government defendants' reasons must be "genuine," not a "*post hoc*" "response to litigation." *Id.* And the defendants must "present[ ] sufficient probative evidence" to support those reasons—evidence that shows the challenged distinction "rests on evidence-informed analysis rather than on stereotypical generalizations." *H.B. Rowe Co. v. Tippett*, 615 F.3d 233, 242 (4th Cir. 2010).

Per *Grimm*, the proviso's restroom ban fails heightened scrutiny because the government lacks "evidence" that it "substantially relate[s]" to an "important governmental objective[]." *Id.* As in *Grimm*, the question is not whether providing separate restrooms for boys and girls is

constitutional. *See* 972 F.3d at 618 & n.17. Instead, the issue is whether the government can justify the proviso's exclusion of transgender students like John from sex-specific restrooms that align with their gender identities. *See id*. It cannot.

*Grimm* held that excluding transgender students from gender-appropriate restrooms does not serve any "interest in protecting students' privacy." *Grimm*, 972 F.3d at 607, 613-14. To claim otherwise "ignores the reality of how a transgender child uses the bathroom: 'by entering a stall and closing the door.'" *Id.* at 613 (quoting *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1052 (7th Cir. 2017)). Transgender children are no more likely to be "peeping tom[s]" than their peers. *Id.* at 614; *accord Whitaker*, 858 F.3d at 1052; JA122. And they "are not any more likely to pose a threat to safety" or violate other students' privacy than are non-transgender students. JA122.

Here, as in *Grimm*, the government contends that its ban is aimed at protecting student privacy. *See* JA449. But here, as in *Grimm*, the government does "not present any evidence that a transgender student . . . is likely to be a peeping tom, rather than minding their own business like

43

any other student." 972 F.3d at 614; *see also* JA122 (explaining no such evidence exists). As in *Grimm*, the government "cite[s] to no incident" to justify its supposed privacy concern. 972 F.3d at 614. And, as in *Grimm*, John had "used the boys restrooms . . . without incident" prior to enforcement of the ban. *Id.*; *see* JA174-175. For all these reasons, the government's asserted justification for the proviso cannot satisfy heightened scrutiny, and John is likely to succeed on his constitutional claim.

### iii.  The ban fails any level of scrutiny

After *Grimm*, there is no question that the ban is subject to heightened scrutiny. *See supra* pp. 38-39. But, regardless, the ban could not survive rational basis review. Even when a law does not trigger heightened scrutiny, the distinctions it draws must "bear a rational relationship to an independent and legitimate legislative end." *Romer*, 517 U.S. at 633. Accordingly, a law may not be "drawn for the purpose of disadvantaging the group burdened by the law." *Id.* "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Id.* at 634. Nor may the government justify a discriminatory law based on "private

biases" or stereotypes: "[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable . . . are not permissible bases" to treat people differently. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985); *accord U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 533-36 (1973) (invalidating food stamp policy under rational basis review where it was based on government's "unsubstantiated assumptions" about "hippies").

As explained, there is no evidence that the ban furthers the government's putative interest in student privacy. *See supra* pp. 43-44. And the record also indicates the law is likely motivated by stereotypes about, and biases against, transgender people. *See supra* pp. 7-8, 40-41. The distinction the proviso draws thus "lacks a rational relationship to legitimate state interests" and violates the Equal Protection Clause under any level of review. *Romer*, 517 U.S. at 632.

### 3. *Grimm* is binding precedent

Below, the government asserted that *United States v. Skrmetti*, 145 S.Ct. 1816 (2025), overruled *Grimm*. *See* JA281-287. That's wrong. A Supreme Court decision only abrogates a decision of this Court if the Supreme Court "specifically rejected the reasoning on which" the Fourth

45

Circuit decision was based, *Qingyun Li v. Holder*, 666 F.3d 147, 150 (4th Cir. 2011), such that the two cases are "*impossible* to reconcile," *United States v. Hunt*, 123 F.4th 697, 702 (4th Cir. 2024). That is a "high bar." *Short v. Hartman*, 87 F.4th 593, 605 (4th Cir. 2023). *Skrmetti* does not come close to it: The decision is easy to reconcile with *Grimm*. *See* Am. Order 21 (Diaz, C.J., concurring) (explaining that *Skrmetti* "has little to say about the issues *Grimm* addressed").

1. In *Skrmetti*, the Supreme Court addressed an equal protection challenge to Tennessee's ban on using certain medications to treat transgender minors' gender dysphoria. *See* 145 S.Ct. at 1824. The Court held that the law classifies based on age: "Healthcare providers may administer certain medical treatments to individuals ages 18 and older but not minors." *Id.* at 1829. The law also classifies based on "medical use": "Healthcare providers may administer puberty blockers or hormones to minors to treat certain conditions," such as precocious puberty, "but not to treat gender dysphoria." *Id.* at 1829-30.

The Court held that the Tennessee law did not classify based on sex. *Id.* at 1829-32. It reasoned that "the law does not prohibit conduct for one sex that it permits for the other" because "*no* minor may be

administered puberty blockers or hormones to treat gender dysphoria," while "minors of *any* sex may be administered puberty blockers or hormones for other purposes." *Id.* at 1831. For similar reasons, *Skrmetti* also held that the law did not classify based on transgender status. *See id.* at 1832-35. As the Court saw it, the Tennessee ban "does not exclude any individual from medical treatments on the basis of transgender status but rather removes one set of diagnoses . . . from the range of treatable conditions." *Id.* at 1833. Accordingly, the case "d[id] not raise th[e] question" of whether "transgender individuals are a suspect of quasi-suspect class." *Id.* at 1832-33. The Court expressly declined to address that question. *See id.*

Because the Court held that the ban did not classify based on sex or transgender status, it applied rational basis review, rather than heightened scrutiny. *See id.* at 1835-37. The law survived that lower standard. *See id.*

2. *Skrmetti* does not even mention Title IX, which is "broader" than the Equal Protection Clause in many respects, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 256 (2009). So it does not affect *Grimm*'s Title IX holding. *See* Am. Order 22 (Diaz, C.J., concurring). John is entitled to

47

an injunction based on that statutory claim alone. *See, e.g.*, *Roe v. Dep't of Def.*, 947 F.3d 207, 212, 234 (4th Cir. 2020) (affirming preliminary injunction because "Plaintiffs have demonstrated a likelihood of success o[n] the merits of at least one claim"); *see also Taylor v. Grubbs*, 930 F.3d 611, 619 (4th Cir. 2019) ("[W]hen a Supreme Court decision abrogates one portion of our rationale in a prior case but not another, the rationale not abrogated . . . binds future panels of this court.").

3. *Skrmetti* also does not conflict with *Grimm*'s Equal Protection holding. *First*, it does not conflict with *Grimm*'s holding that a ban like the proviso triggers heightened scrutiny because it classifies based on sex. As explained, *Skrmetti* held that the Tennessee law at issue classified medical treatments based not on sex but on age and medical use. 145 S.Ct. at 1829. That reasoning does not apply to a restroom ban and so does not disturb *Grimm*. *See K.C. v. Individual Members of Med. Licensing Bd.*, 121 F.4th 604, 617, 621 (7th Cir. 2024) (holding that "assigning a bathroom based on a child's sex unquestionably" classifies based on sex even if a ban on gender-affirming care, like the one in *Skrmetti*, does not). Indeed, the government admits that policies like the proviso classify based on "biological sex." Combined Mot. 17.

*Second*, *Skrmetti* does not conflict with *Grimm*'s independent holding that a ban like the proviso triggers heightened scrutiny because it classifies based on transgender status. *Skrmetti* held that the medical regulation did not turn on transgender status for the same reason it did not turn on sex: It "regulate[d] a class of treatments or conditions" and did not exclude "a class of *persons*" based on their protected traits. 145 S.Ct. at 1834 n.3. The bans in *Grimm* and the proviso do the latter: They exclude John and other transgender boys from restrooms open to non-transgender boys, and likewise for transgender girls. *See Grimm*, 972 F.3d at 610–13; Proviso 1.120(A)(3); Proviso 1.114(A)(3). And *Skrmetti* expressly declined to address whether classifying based on transgender status triggers heightened scrutiny. 145 S.Ct. at 1832-33. So it did not not disturb *Grimm*'s holding that it does. *See* 972 F.3d at 610-13.

For these reasons, the district court was wrong, in its denial of John's motion for an injunction pending appeal, that "*Skrmetti*'s use of a rational basis standard for a gender identity-based equal protection claim appears to conflict with the heightened level of scrutiny applied" in *Grimm*. JA369. *Skrmetti* did not hold that rational basis applies to "gender identity-based equal protection claim[s]." JA369. Rather, it applied

rational basis because it determined the statute at issue did not classify based on gender identity. *See Skrmetti*, 145 S.Ct. at 1832-33.

*Finally*, because *Skrmetti* did not apply heightened scrutiny to any law, let alone a law concerning restroom access, it leaves undisturbed *Grimm*'s conclusion that a restroom ban nearly identical to the proviso's failed under that standard. *See* 972 F.3d at 613-15. So, like the ban in *Grimm*, the proviso's restroom ban violates the Equal Protection Clause.

## B. The ban will likely irreparably harm John and the class absent an injunction

John and the other members of the putative class will likely be irreparably harmed without a preliminary injunction. A plaintiff suffers "irreparable harm" when his injuries are hard to quantify or when money will not fully cure them. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. at 7. The "irreparable harm factor is satisfied" when, as here, "there is a likely constitutional violation." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). This Court has already held that, because the ban "infring[es] [John's] constitutional rights," John has shown "that irreparable

injury is likely in the absence of an injunction." Am. Order 17. The same is necessarily true for the proposed class. The Court need go no further.

The record also demonstrates all the concrete ways John and other putative class members will likely suffer absent an injunction. First, John. The proviso has already caused him to lose a year of in-person schooling. Last fall, under threat from the State, the School District suspended John and threatened to expel him if he tried to use the boys' restrooms again. *See, e.g.*, JA074-075, JA077, JA080-081, JA175-176. To avoid using the restroom, John often held his urine, which was so uncomfortable that he could not focus on his classes. *See* JA176. The ban also spurred peer harassment. *See* JA176; *see also Grimm*, 972 F.3d at 617-18 (noting the "scrutiny and attention" a bathroom ban invites from peers and explicating "[t]he stigma of being forced to use a separate restroom"). John was "so upset by the harassment and invasive monitoring of [his] restroom use at school that, sometimes, [he] could not even go to school." JA176. To avoid the discrimination, John withdrew from the School District and spent the rest of eighth grade trying to learn from home, isolated from peers and disengaged from his studies. *See* JA176, JA330.

Without an injunction, John will again likely face discipline at school, including possible suspensions and even expulsion, for using boys' restrooms. That loss of educational opportunity would be an irreparable harm. *See*, *e.g.*, *Rodiriecus L. v. Waukegan Sch. Dist. No. 60*, 90 F.3d 249, 254 (7th Cir. 1996) ("There is no doubt that the expulsion of a . . . child from school may result in irreparable harm."); *C.G. ex rel. P.G. v. Saucon Valley Sch. Dist.*, 571 F.Supp.3d 430, 444 (E.D. Pa. 2021) ("[C]ompensation in money can never atone for deprivation of a meaningful education in an appropriate manner at the appropriate time.").

And for as long as John can remain in the School District without an injunction, he will suffer the same dignitary, stigmatic, emotional, and physical injuries he faced last year. *See, e.g.*, *supra* p. 32; Am. Order 24-25 (Diaz, C.J. concurring); *see also Whitaker*, 858 F.3d at 1040-42, 1045-46 (holding that a restroom ban's impacts on a student's mental and physical health, and the stigma it imposed, were irreparable injuries); *Grimm ex rel. G.G. v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 728 (4th Cir. 2016) (Davis, J., concurring) (finding, earlier in the same *Grimm* case, that preliminary injunction was warranted based on testimony that bathroom ban was "detrimental to the health and well-being of the

child"); *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) ("Emotional injuries [and] psychological distress . . . may constitute irreparable harm."). John therefore will likely suffer irreparable harm absent an injunction.

The other members of the putative class will also likely suffer. *See supra* pp. 11-14. John's expert has provided evidence that excluding transgender students from gender-appropriate restrooms inflicts profound and often lifelong psychological harm. JA113-114 It leads to physical pain and risks urinary tract and kidney infections because students hold their urine to avoid using the restroom. JA120. It contradicts treatment protocols for gender dysphoria. JA119. It outs students as transgender without their consent. JA119. It invites harassment and violence toward transgender students. JA119-120. It detracts from students' education when they cannot focus in class and miss school as a result. JA121. And, as *Grimm* recognized, even if a school makes a gender-neutral option available, a ban still imposes a "stigma" by "very publicly branding all transgender students with a scarlet 'T'." 972 F.3d at 617-18. These injuries are also irreparable harms that justify a class-wide preliminary injunction.

53

## C. The balance of equities and public interest favor enjoining enforcement of the ban

The balance of equities and public interest strongly favor an injunction. Both "support upholding the rule of law." Am. Order 18. "Here, that encompasses preventing the State from enforcing a policy that directly contradicts *Grimm*—a prior, binding decision of this Court." *Id.* And enforcing constitutional and civil rights is always in the public interest. *See, e.g.*, *Leaders*, 2 F.4th at 346 ("[I]t is well-established that the public interest favors protecting constitutional rights."); *Doe v. Wood Cnty. Bd. of Educ.*, 888 F.Supp.2d 771, 778 (S.D. W. Va. 2012) ("The public interest is certainly served by promoting compliance with Title IX."). So, because John is likely to succeed on his claims, he satisfies this factor.

The record here bears out this categorical rule. John and other transgender students will benefit significantly from an injunction. *See supra* pp. 50-53. On the other side of the ledger, the government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Leaders*, 2 F.4th at 346. Plus, unlike the proviso, the proposed injunction would not require the government to affirmatively do anything. In fact, enjoining

enforcement of the proviso would free teachers and administrators to spend less time policing which restroom John and other transgender students use so they can focus on teaching students.

### D. The Supreme Court's cert grant in *B.P.J.* does not undermine John's entitlement to an injunction

1. In denying John's motion for a preliminary injunction, the district court did not rule on its merits. *See* JA343-346. Rather, it denied the motion because it believes that the Supreme Court *might* abrogate *Grimm* in the coming term. *See* JA344. The Supreme Court, it noted, recently agreed to hear a case out of this Court, *West Virginia v. B.P.J.*, concerning a ban on transgender youth participating in sports teams aligned with their gender identities. *See* JA344 (citing *West Virginia v. B.P.J.*, 2025 WL 1829164 (2025) (No. 24-43)). The district court anticipated that "a decision of the United States Supreme Court in *B.P.J.* has the potential of bringing clarity and providing guidance." JA344. For that reason, the district court *sua sponte* stayed this case, denied the preliminary injunction, and forbade John from renewing his motion until after the Supreme Court either decides *B.P.J.* or concludes its 2025-2026 term. JA346; *see* JA347.

But the district court already has all the "guidance" it needed: *Grimm*, which "remains the law of this Circuit and is thus binding on all district courts within it." Am. Order 17. As this Court recognized when it enjoined the proviso pending appeal, the cert grant in *B.P.J.* "does not alter the currently binding force of *Grimm*." *Id.* at 19. "[S]peculation" about how the Supreme Court might rule in a forthcoming case "is not the proper basis for denying a preliminary injunction . . . when currently binding caselaw compels the conclusion that the movant has satisfied his burden." *Id.*

That is because "[a] decision of a panel of [the Fourth Circuit] becomes the law of the circuit and is binding . . . unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court." *United States v. Collins*, 415 F.3d 304, 311 (4th Cir. 2005). Even when the Supreme Court "grant[s] certiorari" as to a controlling Fourth Circuit case, courts must still apply "the law of this circuit" unless and until the Supreme Court overturns it. *Bethlehem Mines Corp. v. Henderson*, 939 F.2d 143, 151 n.7 (4th Cir. 1991). "[D]istrict courts . . . have no authority to await a ruling by the Supreme Court before applying the circuit court's decision." *Yong v. INS*, 208 F.3d

1116, 1119 n.2 (9th Cir. 2000); *accord McClellan v. Young*, 421 F.2d 690, 691 (6th Cir. 1970); *see Schwab v. Sec'y, Dep't of Corr.*, 507 F.3d 1297, 1298 (11th Cir. 2007) (similar). So, the district court abused its discretion in denying a preliminary injunction based on the grant of certiorari in *B.P.J.*

2. Besides, the Supreme Court's decision in *B.P.J.*, which does not concern access to restrooms, is unlikely to abrogate *Grimm*—especially not in full. Even if, for example, *B.P.J.* holds West Virginia's sex-based athletics ban can survive intermediate scrutiny, it will not abrogate *Grimm*'s holding that the restroom ban at issue here could not. *See supra* pp. 43-44.

Regardless, John cannot lose out on more schooling while he waits for a decision in *B.P.J.* If *B.P.J.* abrogates *Grimm*, this Court, or the district court, can apply that new law when it comes down—including, if necessary, by revisiting any injunction. Today, however, John and the putative class members are entitled to relief, and they desperately need it. The district court assumed that John would not "benefit[]" from an injunction if it were later "revers[ed] or modifi[ed]," JA345, as any preliminary injunction may be. But *B.P.J.*'s resolution is a long way off. And

every day the proviso is enjoined will be another day John can learn and grow at school without facing state-mandated discrimination. He will benefit each day he can focus in class because he does not need to hold his urine. *See* JA176. He will benefit each day he is permitted on school grounds because he has not been suspended or expelled for using boys' restrooms. *See* JA175-176. He will benefit each day he can enjoy equal access to education.

3. When later denying John's motion for an injunction pending appeal—which is not on review here—the district court again declined to resolve the legal questions before it. JA368-372. Instead, it held that John could not demonstrate a likelihood of success on the merits because, in light of the *B.P.J.* certiorari grant and *Skrmetti*, "the law [is] plainly unsettled and in flux." JA371. That decision again flouted this Court's rule that its precedent is binding unless and until it is overturned.

Moreover, even in the absence of controlling precedent, a district court may not deny a preliminary injunction—even "without prejudice"—based on "the difficulty of deciding" the issues. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544-45 (4th Cir. 2023); *see H-D Mich., LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 846 (7th Cir. 2012) (noting "courts

are equipped to handle . . . novel legal questions," which do not "bar . . . a preliminary injunction"); 11A *Wright & Miller's Federal Practice & Procedure* § 2948.3 (3d. ed. 2025) (explaining that denying a preliminary injunction because "difficult questions of law are present . . . is unacceptable as a general rule"). A court can only deny such a motion based on a finding that the plaintiff does not satisfy the test for a preliminary injunction—which requires only a "likelihood," not a certainty, of success. *Frazier*, 86 F.4th at 545.

### E. The district court's decision to deny leave to amend the complaint does not preclude relief

1. In its motion to dismiss, the government argued that this Court lacked "jurisdiction" to reverse the district court's decision to deny relief because, it said, the requested injunction did not relate to the operative complaint, which cited last year's identical iteration of the ban. *See* Combined Mot. 7-9. That objection does not concern jurisdiction. It goes, instead, to the propriety of interim injunctive relief. *See Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997); Am. Order 26-27 (Diaz, C.J., concurring). And such relief is proper so long as the movant can "establish a relationship between the injury claimed in

the party's motion and the conduct asserted in the complaint." *Omega World Travel*, 111 F.3d at 16.

John can do so. His renewed motion for a preliminary injunction and his original complaint challenge the same unlawful conduct by the government: "forbidding Plaintiff John Doe and the Class from using restrooms that correspond to their gender identities." JA031 (Title IX claim); *accord* JA032 (Equal Protection claim); JA332-333 (requesting that the Court enjoin "any . . . rule, policy, or practice that prohibits transgender students from using sex-specific school restrooms consistent with their gender identities"). That conduct will cause the harms identified in his motion. *See supra* pp. 50-53. That relationship is not severed just because John named Proviso 1.120, not the identical Proviso 1.114, in his complaint. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 n.6 (9th Cir. 2020) (declining to stay injunction against enforcement of rule not specifically "challenged in [the] operative complaint" because the rule was part of the "practice" the complaint challenged).

2. In any event, in June, after the government renewed the ban, John moved to amend "to provide the very updates" that the government claims "needed to occur." Am. Order 15. The "proposed amendments

would cure any perceived deficiency in the complaint." *Id.* at 13 n.10. So, if the government is right and John had to amend his complaint to support his renewed motion for a preliminary injunction, the Court should exercise pendent jurisdiction to reverse the district court's denial of his motion to amend. *See Scott*, 733 F.3d at 111 (explaining that pendent appellate jurisdiction is available "when review of a jurisdictionally insufficient issue is necessary to ensure meaningful review of an immediately appealable issue" (citation modified)).

That denial was an abuse of discretion. Denial of leave to amend is appropriate "*only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edwards*, 178 F.3d at 242. None of those factors were present here. Yet the district court denied John's motion to amend for the same reason it denied his motion for a preliminary injunction: the Supreme Court's cert grant in *B.P.J.* JA346-347. That grant does not bear on John's right to amend his complaint. So the district court erred in denying his motion to do so. If necessary, this Court should reverse.

### F.  The Court should grant relief to the putative class

The Court should instruct the district court to grant preliminary relief not only to John but also to the putative class. As the Supreme Court recently affirmed in *A.A.R.P. v. Trump*, "courts may issue temporary relief to a putative class" prior to a ruling on class certification. 145 S.Ct. 1364, 1369 (2025). "[T]he Court's holding [in *A.A.R.P.*] means that the filing of a class suit ('a putative class'), coupled with a showing that the standard for interim relief has been met, is sufficient to enable such relief to the entire putative class. Nothing more, in terms of class certification, is necessary." 2 *Newberg & Rubenstein on Class Actions* § 4:30 (6th ed. 2025); *see also Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("Simply put, there is nothing improper about a preliminary injunction preceding a ruling on class certification.").

Here, John has filed a class suit. JA029-031. And he has demonstrated a preliminary injunction is warranted to protect the putative class while this case proceeds. *See supra* pp. 33-55. The Court should therefore remand to the district court with instructions to grant relief to the putative class.

## III.  The Court should direct the district court to lift the stay

In remanding this case, the Court should vacate the district court's stay. This Court has pendent appellate jurisdiction to review the district court's decision to stay the case, which is "inextricably intertwined" with the denial of the preliminary injunction. Am. Order 9-10. The district court stayed the case until resolution of *B.P.J.* (or the end of the next Supreme Court term) based on the same error that led it to deny the preliminary injunction: its assessment that applicable law was "unsettled." JA344. In doing so, it ignored the "binding" and dispositive "law of th[e] circuit" set by *Grimm*. Am. Order 17. That "misapprehen[sion]" of law was an "abuse of discretion." *League of Women Voters*, 769 F.3d at 235.

Besides, a court may not stay a case to await the outcome of a Supreme Court decision except "in rare circumstances." *Landis*, 299 U.S. at 255. "[I]f there is even a fair possibility" that the stay would "work damage to someone else," the district court may only stay the case if clear "hardship or inequity" will result if the case proceeds. *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983) (quoting *Landis*, 299 U.S. at 255). Yet, faced with impending irreparable harm to John and the class, the district court found no such hardship here.

63

Moreover, as this Court noted in its recent order denying the government's motion to dismiss, remanding for a district court to enter an injunction in a stayed case risks sending a "mandate . . . to a black hole." Am. Order 11 (quoting *Proctor & Gamble Co. v. Kraft Foods Glob., Inc.*, 549 F.3d 842, 847 (Fed. Cir. 2008)). *But see United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993) ("[A] lower court generally is bound to carry the mandate of the upper court into execution." (citation modified)). So, at the very least, this Court should instruct the district court to lift the stay temporarily to the extent necessary to enter relief.

## CONCLUSION

For the reasons explained above, the Court should vacate the district court's denial of the motion for a preliminary injunction and its stay, and remand with instructions for the district court to enter that relief immediately. If necessary, it should also direct the district court to grant John leave to amend his complaint.

Dated: August 27, 2025    Respectfully submitted,

/s/ *Alexandra Z. Brodsky*
Alexandra Z. Brodsky
Sean Ouellette
Adele P. Kimmel
Patrick Archer
PUBLIC JUSTICE
1620 L Street NW
Suite 630
Washington, DC 20036
(202) 797-8600
abrodsky@publicjustice.net
souellette@publicjustice.net
akimmel@publicjustice.net
parcher@publicjustice.net

Leila Nasrolahi
PUBLIC JUSTICE
475 14th Street, Suite 610
Oakland, CA 94612
(510) 622-8150
lnasrolahi@publicjustice.net

Linda M. Correia
Andrew M. Adelman
CORREIA & PUTH PLLC
1400 16th Street NW #450
Washington, DC 20036
(202) 602-6500
lcorreia@correiaputh.com
aadelman@correiaputh.com

Joseph J. Wardenski
WARDENSKI P.C.
134 West 29th Street, Suite 709
New York, NY 10001
(347) 913-3311
joe@wardenskilaw.com

Harper T. Segui
LEE SEGUI PLLC
825 Lowcountry Boulevard
Unit 101
Mount Pleasant, SC 29464
(919) 600-5000
hsegui@leesegui.com

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(7)(B)(i) because it contains 13,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in 14-point Century Schoolbook font.

Dated: August 27, 2025      */s/ Alexandra Z. Brodsky*
Alexandra Z. Brodsky
*Counsel for Plaintiff-Appellant*